## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |
|---|---|
| RUSSELL HAROLD and SEAN WILLIAMS, on behalf of themselves and others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) Case No. ) |
| v. | ) CLASS ACTION ) JURY DEMANDED |
| LESLIE RICHARDS, in her official capacity as Secretary of the Pennsylvania Department of Transportation; LEO BAGLEY, in his official capacity as Executive Deputy Secretary of the Pennsylvania Department of Transportation; KURT MYERS, in his official capacity as Deputy Secretary for Driver and Vehicle Services of the Pennsylvania Department of Transportation, TOM WOLF, in his official capacity as Governor of Pennsylvania; | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

_____

## CLASS ACTION COMPLAINT

### Introduction

1.     This case is about the Pennsylvania Department of Transportation operating a discriminatory driver's license suspension scheme that imposes additional and counterproductive punishment on any person convicted of a drug-related offense.   The Department of Transportation automatically suspends the driver's license of any person convicted of a drug offense — even where the offense is unrelated to driving — for up to two years, affecting virtually aspect of their lives and crippling their ability to successfully rehabilitate and care for their families.   For people already facing the harsh realities of living with a criminal conviction, the ability to find and maintain gainful employment, pursue education, keep medical

1

appointments, and care for dependent family members is essential to a stable post-conviction life. By imposing additional and debilitating measures against people with drug convictions, Defendants make successful post-conviction rehabilitation a near impossibility.

2.     Pennsylvania's animus toward people with drug convictions is evident: excluding offenses related to traffic safety, drug convictions are the *only* crimes for which the Department of Transportation suspends the driver's licenses of adults over 21. *See* 75 Pa. Const. Stat. Ann. § 1532(c). Defendants thus punish people found in possession of a small amount of marijuana (unrelated to driving) as harshly as those who have been convicted of aggravated assault while driving under the influence, vehicular manslaughter, or any other dangerous activity that results in the loss of one's ability to drive. *See* 75 Pa. Const. Stat. Ann. §§ 1532(a)-(c).

3.     Drug convictions, in and of themselves, are wholly unrelated to traffic safety; Pennsylvania's suspension policy can only be explained as state-sanctioned discrimination on the basis of a particular animus toward people with drug convictions.

4.     An overwhelming majority of the states — 38 out of 50 — have abolished their analogous drug-related suspension policies in an effort to ensure successful rehabilitation of former drug offenders. Yet in Pennsylvania, over 149,000 people have lost their licenses due to a drug-related conviction since 2011.

5.     Automatic and extended periods of license suspension for individuals who pose no demonstrated risk to traffic safety is irrational, counterproductive, and discriminatory. License suspension burdens virtually every aspect of a person's life while undercutting the state's interests in rehabilitation and decreasing recidivism. By and through their attorneys, on behalf of themselves and others similarly situated, Plaintiffs seek declaratory and injunctive relief against Defendants in their official capacities as officers of the Commonwealth of

Pennsylvania and the Pennsylvania Department of Transportation to end this unconstitutional license suspension scheme because it violates the Equal Protection and Due Process Clauses of the United States Constitution.

### Nature of the Action[1]

6.     The Department of Transportation, at the direction of, or by and through Defendants, automatically suspends the driver's licenses of people who are convicted of "any offense involving the possession, sale, delivery, offering for sale, holding for sale, or giving away of any controlled substance" under Pennsylvania law, federal law, or the law of any other state, regardless of whether the offense involved a vehicle or traffic safety or whether the offense is considered a crime at all in Pennsylvania.  75 Pa. Const. Stat. Ann. § 1532(c).

7.     Defendants violate Plaintiffs' equal protection rights because the state's suspension scheme lacks any rational basis and can be explained solely as animus against a disfavored class of persons: people with drug convictions.  On its face, § 1532(c) distinguishes between those convicted of drug offenses and all other criminal offenders, targeting the former for additional punishment.  Automatically suspending the driver's licenses of people who have been convicted of drug offenses — and already punished by a criminal sentencing court — satisfies no legitimate government interest and is in fact counterproductive.

8.     Defendants violate Plaintiffs' procedural due process rights because they have a property interest in their drivers' licenses that may not be deprived without due process of law. By creating an irrebuttable presumption against people with drug convictions — and automatically depriving them of their liberty and property interests without any process

---

[1] Where not cited, Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement, and information and belief as to all other matters.

whatsoever — Defendants violate Plaintiff's procedural due process rights under the Due Process Clause of the Fourteenth Amendment.

9.     Defendants violate Plaintiffs' substantive due process rights because they have a fundamental right to both interstate and intrastate, or local, travel. Without meaningful alternatives to driving, a license suspension's broad prohibition on all driving under all circumstances deprives people of their fundamental rights without being narrowly tailored to a significant government interest.

### Jurisdiction and Venue

10.     This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, *et seq.*, and the Fourteenth Amendment to the United States Constitution.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

### Parties

12.     Russell Harold Jr. is a 52-year-old resident of Philadelphia, Pennsylvania.  Mr. Harold has a disability and lives with his father.  He is the father of six children and grandfather of nine grandchildren.  His license is suspended under § 1532(c) until approximately October of 2019.

13.     Sean Williams is a 25-year-old resident of Philadelphia, Pennsylvania.  He lives with his grandmother and is the father of a newborn son.  His license is suspended under § 1532(c) until March of 2019.

14.     Defendant Tom Wolf is the Governor of the Commonwealth of Pennsylvania.

15.     As Governor, Mr. Wolf is the head of the executive branch of the Pennsylvania state government and is responsible for enforcing state law.  He oversees and is responsible for

the Secretary of the Department of Transportation as one of his executive cabinet members.  Mr. Wolf is sued in his official capacity as the Governor of the Commonwealth of Pennsylvania.

16.    Defendant Leslie Richards is the Secretary of the Pennsylvania Department of Transportation ("PennDOT").

17.    Defendant Leslie Richards oversees and is ultimately responsible for all actions of PennDOT, which has exclusive authority to suspend or revoke driver's licenses for drug convictions.  *See* 75 Pa. Const. Stat. Ann. §§ 102 and 1532.  Ms. Richards is sued in her official capacity as the Secretary of the Department of Transportation.

18.    Defendant Leo Bagley is the Executive Deputy Secretary of the Department of Transportation.

19.    Mr. Bagley oversees and is responsible for the administration of PennDOT's five lower departments, including Driver and Vehicle Services.  *Transportation Organizational Chart*, Pennsylvania Office of Administration (Dec. 19, 2017).[2]  Mr. Bagley is sued in his official capacity as Executive Deputy Secretary of the Department of Transportation.

20.    Defendant Kurt Myers is the Deputy Secretary for Driver and Vehicle Services of the Department of Transportation.

21.    Mr. Myers oversees and is responsible for the actions of the Bureau of Driver Licensing, which includes the Driver License Division, the Driver Safety Division, and the License Control Division.  *Id.*  As Deputy Secretary for Driver and Vehicle Services, he "is responsible for the regulatory oversight of 97 facilities across the commonwealth that issue driver's licenses."  *Deputy Secretary for Driver and Vehicle Services*, Pennsylvania Department

---

[2] http://www.oa.pa.gov/Policies/Documents/Transportation.pdf

of Transportation (last visited Jan. 3, 2018).[3]  Mr. Myers is sued in his official capacity as the Deputy Secretary for Driver and Vehicle Services of the Department of Transportation.

22.    At all times relevant to the events, acts, and/or omissions alleged in this Complaint, Defendants have acted under color of state law, pursuant to their authority and responsibilities as officials of the Commonwealth of Pennsylvania.

### Factual Allegations

23.    The State of Pennsylvania enforces, through state officials of the Department of Transportation, suspensions of driver's licenses for any person convicted of possession, sale, delivery, offering for sale, holding for sale, or giving away of any controlled substance under the law of *any* jurisdiction, even when that conviction has no relation to traffic safety whatsoever, or is not even considered a criminal offense in Pennsylvania.  75 Pa. Const. Stat. Ann. § 1532(c).

24.    This targeted punishment is inflicted automatically in addition to the sentence already deemed appropriate and imposed through criminal adjudication of the underlying drug offense.

25.    The clerk of the convicting court automatically notifies PennDOT of each drug conviction by sending a notification form to PennDOT's Bureau of Driver Licensing.

26.    Defendants do not credit time to an offender's suspension period immediately upon suspension of a license; although it is illegal for them to drive at any point after a license suspension, people with drug convictions will not earn any credit toward their suspension period until they have surrendered their physical license and an affidavit to PennDOT.

---

[3]http://www.penndot.gov/about-us/DepartmentExecutives/Pages/DeputySecretaryforDriverandVehicleServices.aspx

27.    To reinstate a suspended license, Defendants require people with suspended licenses to pay a restoration fee.  As of September 2017, the restoration fee is $73, but is "subject to change" at PennDOT's discretion.  Ex. 1, PennDOT Letter to Sean Williams, p. 2.

28.    Between 2011 and 2016, Pennsylvania suspended the licenses of nearly 149,000 drivers for drug convictions unrelated to traffic safety.

29.    On information and belief, thousands of people in Pennsylvania currently have a suspended license for a drug-related conviction.

30.    Defendants' license suspension scheme is problematic not only for *how* it burdens, but *whom* it burdens.  Pennsylvania's impoverished neighborhoods and predominantly Black neighborhoods are more likely to be policed than affluent or white ones, and Black Pennsylvanians are more likely to be stopped, frisked, and arrested for drug possession than any other group.  Instead of operating a scheme that targets dangerous drivers, Defendants' scheme is based on drug convictions — a measure that disproportionately represents people living in poor or predominantly Black neighborhoods, thus disrupting family life and making employment, healthcare, and education substantially more difficult to access for a particular subset of targeted people.

31.    Levying additional punishments against offenders who have already been sentenced by a court of law is irrational — license suspension only hinders former drug offenders from finding and maintaining lawful work, obtaining necessary medical care, supporting dependent relatives, and maintaining stabilizing social connections while dealing with the fallout of a drug conviction.

A.    **Plaintiffs' Suspensions for Minor Drug Offenses Are Driving Them Further into Poverty, Preventing Them from Caring for Their Families, and Undermining Pennsylvania's Interest in Having Working, Productive Citizens**

7

32.    Plaintiffs are former drug offenders who have had their licenses automatically suspended until 2019 for drug-related convictions.

### i.    Russell Harold

33.    Russell Harold is a 52-year-old resident of Philadelphia, Pennsylvania.  Ex. 2, Harold Decl.

34.    In 2017, Mr. Harold was found in possession of a small amount of marijuana and Xanax.  Because he had two prior convictions over the span of his lifetime — including a conviction occurring thirty years ago, in 1988 — Mr. Harold lost his license for two years, a punishment that will endure until late 2019.

35.    At the time of Mr. Harold's first conviction, his offense was not punishable by automatic license suspension.  Regardless, his current license suspension has been increased by a year as retroactive punishment for that offense, which occurred three decades ago before the license suspension law existed.

36.    Mr. Harold's conviction was unrelated to traffic safety and did not involve an automobile of any kind.

37.    Mr. Harold has a diagnosed disability.  His disability, along with other medical issues, requires him to see a doctor several times a month.

38.    As a result of his license suspension and unreliable public transportation, Mr. Harold has missed several of his doctor's appointments since his license was suspended.  Mr. Harold's disability has been exacerbated by his license suspension, making it difficult for him to schedule and attend new doctor's appointments.  He feels confined to his home and unable to properly care for himself.

39.     Despite his disability, Mr. Harold started his own home cleaning business and operated it successfully for over six years, using his personal vehicle for transportation to and from clients' homes.

40.     Because of his license suspension, Mr. Harold can no longer operate his cleaning business on his own; he can only work if his clients agree to transport him and his cleaning supplies to and from their houses.  Mr. Harold has had to sleep at his clients' homes when they could not bring him back the same day.

41.     Many of Mr. Harold's former clients are inaccessible by public transportation and unwilling to pick him up and drop him off each time their home needs to be cleaned.  As a result, Mr. Harold has lost a substantial amount of business and income.

42.     When Mr. Harold had a valid license, he made approximately $700 a week cleaning homes.  Now that his license is suspended, if Mr. Harold can find work, he makes no more than $200 a week.

43.     Mr. Harold often goes weeks without any work at all.

44.     Mr. Harold is actively seeking work to support himself after the loss of his license.  Because he cannot drive to look for work, he looks for jobs online and subscribes to text message notifications for job openings.

45.     Mr. Harold has seen many job openings that he wants to pursue, but he cannot apply to them solely because he has no driver's license.  Mr. Harold has been forced to forgo several job opportunities that require driving, that are inaccessible by public transportation, or that require working hours outside public transportation's operating hours.

46.     Despite his best efforts, Mr. Harold has been unable to find a job since the loss of his license.

47.    Mr. Harold's girlfriend has a medical condition in her eyes that requires frequent medical treatment.  Because her treatments affect her ability to see, she cannot drive home from the doctor.

48.    Now that Mr. Harold's license is suspended, he cannot take care of his girlfriend by driving her to and from the doctor.  Instead, all he can do is escort her home on public transportation because she is unable to see.

49.    Mr. Harold is the father of six children and the grandfather of nine grandchildren. He cherishes time with his family, and when he had a driver's license he saw his family members on a regular basis.

50.    Mr. Harold's children and grandchildren live outside of Philadelphia, inaccessible by public transportation.

51.    Because of his license suspension, Mr. Harold has gone months without seeing his family.

### ii.    Sean Williams

52.    Sean Williams is a 25-year-old resident of Philadelphia, Pennsylvania.  Ex. 3, Williams Decl.

53.    Mr. Williams is stopped and frisked nearly every time he leaves his home in west Philadelphia.

54.    He has only been arrested three times, each in 2017 for marijuana-related offenses.  Mr. Williams was found in possession of only small, personal amounts of marijuana each time.

55.    As a result of his convictions, Mr. Williams' license is suspended until March 2019.

56. At the time of his suspension, Mr. Williams had been driving on a learner's permit for approximately two years.

57. Mr. Williams' permit is no longer valid as a result of his suspension. When his suspension period ends, he will have to complete the permitting process again — this includes paying additional fees, taking a written test, and paying for a doctor's visit for a full physical exam.

58. None of Mr. Williams' convictions were related to traffic safety or even involved an automobile. In fact, Mr. Williams has never been cited for a traffic- or car-related infraction of any kind. He has a perfect driving record.

59. Mr. Williams is looking for work to support himself and his newborn son. He cannot drive to look for jobs, but he searches for opportunities online.

60. Mr. Williams has seen many job openings that he wants to pursue, but he cannot apply solely because he cannot drive. Because of his driving suspension, Mr. Williams has been unable to apply for otherwise available jobs that require driving, that are inaccessible by public transportation, or that require working hours outside public transportation's operating hours.

61. Mr. Williams was sentenced to probation for his drug-related offenses and must take public transportation to meet with his probation officer each month. Due to unexpected delays in public transportation, Mr. Williams has been late to meet with his probation officer several times, jeopardizing his probation status.

62. Mr. Williams lives with his grandmother, and he is her primary caretaker. Mr. Williams' grandmother has Lupus disease, arthritis, and an eye condition that makes it difficult for her to see. She must see a doctor three to four times a month, and sometimes more often.

63.     When Mr. Williams had his permit, he drove his grandmother to and from her daily activities, including her doctor's appointments.

64.     Because of Mr. Williams' driving suspension, his grandmother must now walk or take public transportation to her doctor's appointments, despite the fact that she experiences difficulty with her eyesight and is often in severe pain.

65.     Mr. Williams' first child, a son, was born prematurely in April 2017.

66.     Mr. Williams' son has been in intensive care at the hospital for the past eight months.  Mr. Williams takes public transportation every day to see him.

67.     Mr. Williams' son is coming home from the hospital soon.  As a premature infant he will require frequent medical appointments, and because of his vulnerability, public transportation poses a hazard to his health.

68.     Because Mr. Williams cannot drive, he will be unable to take his son to necessary doctor's appointments or to visit family members.

69.     If an emergency occurs with Mr. Williams' son, he will be unable to drive him to seek emergency medical help.

**B.     Pennsylvania Runs an Irrational License Suspension Scheme that Increases the Chances of Recidivism and Inflicts Additional Hardships on Those Who Have Already Been Sentenced**

70.     A valid driver's license is essential for people to secure and maintain employment, and the loss of a license often results in further financial hardship for individuals and their families.  License suspension drastically lowers the chance of a person's successful reintegration into society; indeed, it undercuts the state's interest in preventing recidivism.

71.     Research has consistently found that having a driver's license can be necessary to maintain a job, pursue educational opportunities, and care for children and dependent relatives.

*See* "Letter to Colleague" from Vanita Gupta & Lisa Foster, U.S. Department of Justice (Mar. 14, 2016).[4]

72.    License suspension exacerbates poverty, trapping low-income people in an inescapable cycle: not only is loss of a license a direct barrier to finding employment, but many employers require the possession of a valid driver's license before hiring in the first place.  Alana Semuels, "No Driver's License, No Job," *The Atlantic* (June 15, 2016).[5]  A valid driver's license is also essential to maintaining employment if it can be secured.  *Id.*

73.    Indeed, a rigorous study of New Jersey drivers found 42% of drivers lost their jobs after their driving abilities were suspended.    Jon A. Carnegie, Ian M. Voorhees Transportation Center, Rutgers, The State University of New Jersey, *Driver's License Suspensions, Impacts and Fairness Study* 56 (2007).[6]

74.    Of those drivers, 45% were unable to find new employment.  *Id.*

75.    Not only do people often struggle to overcome past drug convictions when seeking work, but people like Mr. Harold — who has lost most of his work with the loss of his license — and Mr. Williams — who has been unable to find lawful employment without a license — face the prospect of extended and virtually inescapable unemployment as a result of Defendants' license suspension scheme.

76.    Ranking 38th out of the 50 states, Pennsylvania has one of the highest levels of unemployment in the country.  "Unemployment Rates for States, Seasonally Adjusted," *U.S. Bureau of Labor Statistics*.[7]

---

[4] https://www.justice.gov/crt/file/832461/download
[5] https://www.theatlantic.com/business/archive/2016/06/no-drivers-license-no-job/486653
[6] http://www.nj.gov/transportation/refdata/research/reports/FHWA-NJ-2007-020-V1.pdf
[7] https://www.bls.gov/web/laus/laumstrk.htm (last visited Sept. 19, 2017)

77.     Unemployment can, and often does, lead to recidivism — numerous studies show that obtaining and maintaining stable employment after a drug conviction is critical to successful social reentry.  *See, e.g.*, Mark Berg & Beth Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment and Recidivism*, 28 Just. Q. 382 (2011).[8]

78.     By making employment opportunities harder to access and maintain, license suspensions create economic uncertainty, increasing the chances of recidivism and decreasing the chances of successful social reentry.  Former drug offenders with little to no chance of obtaining legal employment are often vulnerable to drug use and drug-related forms of economic survival.  Ex. 4, Henin Decl., ¶ 11.  On the other hand, dependable employment is a critically important tool for preventing this phenomenon.

79.     Indeed, a five-year study conducted by Indiana's Department of Corrections found that "post-release employment was the most important predictor of recidivism among drug offenders.  In other words, drug offenders would likely become recidivists if they were unemployed after release from prison."  John M. Nally et al., *Post-Release Recidivism and Employment among Different Types of Released Offenders: A 5-Year Follow-up Study in the United States*, 9 Int'l J. Crim. Just. Sci. 16, 27 (2014).[9]

80.     License suspension imposes a barrier to law-abiding behavior when it is needed the most: after a conviction, individuals placed on probation have a multitude of court-ordered obligations and constraints (critical to their post-conviction success) that become significantly more burdensome without reliable transportation.

81.     Individuals on probation are required to report to their probation officer at regular intervals (or upon immediate request), and proof of a rigorous effort to secure and maintain

---

[8] http://www.pacific-gateway.org/reentry,%20employment%20and%20recidivism.pdf
[9] http://www.sascv.org/ijcjs/pdfs/nallyetalijcjs2014vol9issue1.pdf

stable employment is a condition of probation throughout Pennsylvania. Failure to comply with these conditions can lead to arrest and incarceration. *See, e.g.*, First Judicial Dist. of Pa., Adult Probation and Parole Department*, Rules of Probation & Parole*;[10] *see also* Fifth Judicial Dist. of Pa., *Adult Probation Rules*;[11] Montgomery County Adult Probation and Parole Department, *Rules and Conditions Governing Probation/Parole and Intermediate Punishment.*[12]

82.    Thus, license suspension for former drug offenders creates a vicious cycle: a conviction automatically results in license suspension, which creates barriers to employment and probation compliance, which puts individuals at risk of incarceration and/or continued entanglement with the criminal justice system.

83.    License suspension strips people with drug convictions of their ability to maintain important family ties and provide for their dependent family members. Numerous studies show that family ties deter recidivism by insulating former offenders from criminal influences and providing a sense of identity grounded in responsibility and law-abiding behavior. *See, e.g.*, Mark Berg & Beth Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment and Recidivism*, 28 Just. Q. 382 (2011).[13]

84.    Former offenders like Mr. Harold and Mr. Williams are deprived of crucial post-conviction stability when license suspension prevents them from seeing their families. For someone like Mr. Williams, who just became a father to a vulnerable infant, license suspension is particularly damaging as it prevents him from properly caring for his son and deprives him of a new and potentially stabilizing identity — being a reliable father.

---

[10] http://www.appa-net.org/psn/docs/Phila_PP_Rules.pdf (last visited Sept. 22, 2017)
[11] https://www.alleghenycourts.us/criminal/adult_probation/rules.aspx (last visited Sept. 22, 2017)
[12] http://www.montcopa.org/DocumentCenter/View/721 (last visited Sept. 22, 2017)
[13] http://www.pacific-gateway.org/reentry,%20employment%20and%20recidivism.pdf

85. Because of the hardship of living without reliable transportation, it is estimated that 75% of those with suspended licenses break the law and continue to drive. *American Association of Motor Vehicle Administrators,* Suspended and Revoked Drivers Working Group, Best Practices 2013, p. 4.[14]

86. In Pennsylvania, individuals who drive with suspended licenses subject themselves to the possibility of a summary offense conviction, a $200 fine, and an additional year of license suspension. 75 Pa. Const. Stat. Ann. §§ 1543(a) and 1543(c)(1).

87. Trapping people with drug convictions in a cycle of economic hardship, possible traffic-related infractions, and possible incarceration does not serve societal or government interests; instead, it simply hinders those attempting to reform their lives and increases the chances of recidivism.

## C. Pennsylvania's Irrational Drug-Related License Suspension Scheme Violates Plaintiffs' Equal Protection Rights

88. On its face, § 1532(c) distinguishes between those convicted of drug offenses and all other criminal offenders, singling out people with drug convictions for additional punishment.

89. In contrast, Pennsylvania does not suspend licenses for numerous offenses that pose a demonstrated threat to traffic safety, or for convictions that might indicate a proclivity for unsafe driving — such as public intoxication, speeding, failing to properly secure a child in a car seat, texting and driving, or failing to yield to a pedestrian.

90. Our criminal justice system should not target certain offenders to set them up for failure — but that is exactly what license suspension for a drug conviction does. Defendants' scheme is irrational, counterproductive, and discriminatory.

---

[14] http://www.aamva.org/Suspended-and-Revoked-Drivers-Working-Group/

91.    Pennsylvania's practice is not rationally related to any legitimate government goal and serves no discernible government interests other than those motivated by bias.  As a counterproductive relic of the failed war on drugs, Pennsylvania's license suspension scheme discriminates against former drug offenders in violation of the Fourteenth Amendment.

       **i.**      **Defendants' License Suspension Scheme is Not Rationally Related to Any Legitimate State Interest**

92.    Defendants' practice of singling out those convicted of drug-related offenses is an attempt to punish drug offenders beyond their lawful sentence and to burden virtually every aspect of their lives.  Drug convictions in and of themselves are unrelated to traffic safety; Pennsylvania's suspension policy can only be explained as state-sanctioned discrimination on the basis of a particular animus toward people with drug convictions.

93.    Pennsylvania's classification against those with drug convictions is unrelated to traffic safety bears no rational relationship to any legitimate state objective and is indeed counterproductive.

94.    Suspension of a driver's license for a non-traffic-related drug offense does nothing to advance the government goal of crime reduction.  License suspensions create barriers to life necessities and rehabilitative opportunities, increasing a person's likelihood of violating probation, recidivating, or breaking the law by driving on a suspended license.  By stripping former offenders of meaningful opportunities, license suspension can increase involvement with the criminal justice system, increases the risk of recidivism, and undermines the substantial government goal of reducing crime.  Ex. 4, Henin Decl., ¶ 5–6, 10.

95.    Suspension of a driver's license for a non-traffic-related drug offense does nothing to advance the government goal of deterrence.  Ex. 4, Henin Decl., ¶¶ 7–9 (stating public defenders in Philadelphia "have noticed no decrease in the frequency or severity of drug-related

arrests and convictions" since the Philadelphia courts began enforcing the drug suspension law). Imposing driving penalties for non-driving-related offenses does nothing to deter involvement with illegal drugs; indeed, the American Association of Motor Vehicle Administrators has found that "there is no evidence which indicates that suspending a person's driving privileges for social non-conformance reasons is effective in gaining compliance with the reason for the original non-driving suspension." *American Association of Motor Vehicle Administrators,* Suspended and Revoked Drivers Working Group, Best Practices 2013, p. 4.[15]

96.     Moreover, retributive and deterrent government interests do not justify the Department of Transportation's discriminatory scheme, as those interests must be — and indeed already are — properly addressed by the criminal court that handles drug offender sentencing.

97.     Suspension of a driver's license for a non-traffic related drug offense does nothing to advance a government interest in traffic safety.  Because Defendants suspend licenses for offenses completely unrelated to traffic safety, their punitive scheme targets safe drivers like Mr. Williams — who has never been cited for a traffic-related offense of any kind — without improving road safety in any way.

98.     Automatic license suspensions for drug offenses may actually jeopardize public safety.  Safe drivers with suspended licenses often drive out of necessity even while their licenses remain suspended, requiring law enforcement to devote time to policing noncompliance rather than focusing on legitimate threats to traffic safety.  A study of license suspensions and law enforcement conducted in Pennsylvania and seven other states found that "less traffic enforcement of highway safety violations occur[s] as suspensions for social non-compliance increase." *American Association of Motor Vehicle Administrators,* Suspended and Revoked Drivers Working Group, Best Practices 2013, p. 9.

---

[15] http://www.aamva.org/Suspended-and-Revoked-Drivers-Working-Group/

99.     Indeed, the study of suspended and revoked driver's licenses in Pennsylvania found "[t]here is significant and increasing frustration in the law enforcement community as a result of the increased administrative workload and time and energy required for non-driving related offenses," suggesting that non-traffic related license suspension burdens public safety resources rather than increases public safety. *Id.* at 13.

100.    Defendants' scheme is counterproductive and serves no legitimate state interest: increasing unemployment for those attempting to rebuild their lives after a drug conviction is not a legitimate state interest; preventing former drug offenders from obtaining lawful work is not a legitimate state interest; creating economic barriers for those most likely to be found in possession of drugs — those who are disproportionately targeted by law enforcement for minor drug crimes — is not a legitimate state interest.

101.    Preventing people with drug convictions from obtaining or continuing to work in lawful occupations is unreasonable and does nothing to deter drug crime. In fact, erecting barriers to lawful employment may incentivize drug-related forms of economic survival taken out of necessity. Ex. 4, Henin Decl., ¶ 11.

102.    Defendants' targeting of drug offenders is an impermissibly broad classification that violates equal protection. There is nothing to suggest that drug offenders pose a greater risk to road safety than any other person with a criminal conviction, or for that matter, any other person in the general population. By arbitrarily expanding license suspension to affect drug offenders — who pose no verified risk to traffic safety greater than any other driver — Defendants create an over-inclusive classification in violation of the Equal Protection Clause.

103.    A classification that is over-inclusive undercuts any government claim that the classification is rationally related to the state's interests.

104.    Any rational basis proffered for license suspension on the basis of deterrence or punishment for drug-related behavior is severely undercut by Pennsylvania's suspension of licenses for convictions involving substances *not* criminalized or controlled by the state of Pennsylvania.  *See* 75 Pa. Const. Stat. Ann. § 1532(c).   The state cannot claim deterrence as a justification for suspending licenses for convictions involving a substance that the State itself does not regard as illegal.  It is logically impossible for Pennsylvania to assert as a legitimate state goal the deterrence of crimes which it has shown no interest in deterring or punishing.

105.    All conceivable rational justifications for Pennsylvania's discrimination against drug offenders are foreclosed; instead, Defendants' license suspension scheme is a discriminatory and irrational measure that does nothing more than undermine former drug offenders trying to rebuild their lives.

### a.    Defendants' License Suspension Scheme Discriminates Against People Who Are Unpopular Rather Than a Threat to Traffic Safety

106.    The Equal Protection Clause requires states to refrain from classifications that are "arbitrary or irrational" or that are predicated on prejudice against a politically unpopular group. *New Directions Treatment Serv. v. City of Reading*, 490 F.3d 293, 301 (3rd Cir. 2007). Defendants' practice of targeting any person convicted of a drug-related offense for license suspension is the result of a classification policy predicated on bias, enacted at the height of the country's "war on drugs."

107.    In the early 1990s, Congress passed a series of bills threatening to withhold highway funding from any state that did not suspend licenses for certain non-traffic-related offenses.  *See* Rebecca Beitsch, *States Reconsider Driver's License Suspensions for People with*

*Drug Convictions,* Pew Charitable Trusts Research & Analysis (Jan. 31, 2017).[16]  Pennsylvania's

practice of suspending licenses for drug convictions immediately followed.  *See Act No. 1993 —*

*33, S.B. No. 970 Vehicles, 177th Regular Session of the General Assembly,* 1993 Pa. Legis. Serv.

Act 1993-33 (S.B. 90).

108.   This federal requirement was motivated by animus toward low-level drug

offenders.   When the first version of this eventual bill was introduced in the United States

Congress, sponsoring Senator Frank Lautenberg lamented that "[too] few casual drug users will

ever see the inside of a jail cell."  *Drug Offender's Driving Privileges Suspension Act of 1989:*

*Hearing on S. 1804 Before the Subcomm. on Water Res., Transp., and Infrastructure of the S.*

*Comm. on Env't and Pub. Works,* S. Hrg. 101-472, 101 Cong. 2 (1989).  Representative Gerald

Solomon described casual drug users with loathing, and he claimed that "jail[ing] — and in some

cases even execut[ing] — those involved in the sale of drugs" was "not enough."  Only "[t]aking

away driver's licenses in an automobile-oriented society will show that we are serious."  *Id.* at

12–13.

109.   An overwhelming majority of the states — 38 out of 50 — have since abolished

their drug-related suspension policies in an effort to ensure successful rehabilitation of former

drug offenders.  *See* Rebecca Beitsch, *States Reconsider Driver's License Suspensions for*

*People with Drug Convictions,* Pew Charitable Trusts Research & Analysis (Jan. 31, 2017).[17]

110.   By contrast, Pennsylvania not only adopted Congress' discriminatory policy

against drug offenders, but has renewed it at each opportunity for over two decades.  *See, e.g.,*

*178th Regular Session of the General Assembly,* 1994 Pa. Legis. Serv. Act 1994-143 (S.B. 143);

---

[16]http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2017/01/31/states-reconsider-drivers-
license-suspensions-for-people-with-drug-convictions
[17]http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2017/01/31/states-reconsider-drivers-
license-suspensions-for-people-with-drug-convictions

*see also 182nd Regular Session of the General Assembly,* 1998 Pa. Legis. Serv. Act 1998-151 (H.B. 433); *183rd Regular Session of the General Assembly,* 1999 Pa. Legis. Serv. Act 1999-23 (H.B. 10); *185th Regular Session of the General Assembly,* 2002 Pa. Legis. Serv. Act 2002-114 (H.B. 2164); *187th Regular Session of the General Assembly,* 2003 Pa. Legis. Serv. Act 2003-24 (S.B. 8); *188th Regular Session of the General Assembly,* 2004 Pa. Legis. Serv. Act 2004-237 (H.B. 2873).

111.    Pennsylvania's animus toward drug offenders is evident in its continued renewal of the drug suspension law, even while most states abolish their discriminatory practice.  During one legislative session, Pennsylvanian Senator Michael O'Pake described the vindictive purpose of § 1532's suspension power as one that allowed the legislature to "[h]it them where it hurts, and that is their ability to drive a vehicle[.]"  *Pennsylvania Senate Regular Session, PA S. Jour., 199 Reg. Sess. No. 27,* 183rd General Assembly (May 4, 1999) (statement of Senator Michael O'Pake).

112.    Pennsylvania's animus toward drug offenders is evident when assessing the pattern of how, and upon whom, the state's license suspension power is used.

113.    In many instances, Defendants suspend licenses for offenses that pose a serious threat to traffic safety, and even to human life, for periods equal to or shorter than those to which drug offenders are subjected.

114.    For instance, first-time drug offenders will have their licenses suspended for the same amount of time as a person convicted of reckless driving, driving without lights on to avoid identification or arrest, or racing on highways.  *See* 75 Pa. Const. Stat. Ann. § 1532(b)(1).

115.    A person who has two or three drug convictions, even if they span a period of thirty years, will have their license suspended for the same or a *longer* period of time than

22

someone convicted of vehicular aggravated assault while driving under the influence, causing death or bodily injury while not licensed to drive, or committing a hit-and-run that results in death.  *See* 75 Pa. Const. Stat. Ann. § 1532(a)(3).

116.    Pennsylvania's practice of suspending licenses for drug offenses that do not threaten public safety, while permitting the same or more lenient treatment for offenses that imperil lives and public safety, is irrational and can only be explained as motivated by animus.

117.    Pennsylvania uses its license suspension power specifically to target and punish drug offenders on the basis of prejudice against an unpopular group.

> ii.    **Defendants' Arbitrary Classification Captures a Group of People Not Rationally Related to State Interests, Exacerbating Economic and Racial Disparities**

118.    Defendants' license suspension scheme is unconstitutional because it discriminates against people with drug convictions without any rational connection to legitimate state interests.  The irrationality of Defendants' scheme is demonstrated by the eligibility criterion used by Pennsylvania for suspensions — a drug conviction — which is not logically connected to state interests in driving regulation, and that perpetuates economic and racial disparities.  While Plaintiffs do not challenge the license suspension scheme as racially discriminatory, they highlight the irrational nature of Defendants' scheme through its reliance on a racially and economically skewed measure.

119.    Nothing suggests that people with drug-related convictions pose a danger to traffic safety more than any other lawbreaker or any other person on the road — indeed, people with drug-related convictions do not necessarily even *break the law* more than any other person on the road.  Because certain neighborhoods experience greater police presence than others, people living in poor or predominantly Black neighborhoods are more likely to be stopped, more likely to be found in possession of drugs, and more likely to be convicted of a drug-related

offense — despite equivalent drug usage rates across people of all races for substances like marijuana. *Cannabis Crackdown Report*, ACLU of Pennsylvania (2017);[18] *see also* Ex. 4, Henin Decl., ¶¶ 12–14.

120. Thus, the triggering event that Pennsylvania stakes its license suspension scheme on — a drug *conviction* — is inherently flawed. In the same way it does not necessarily capture those who pose a threat to public safety, it does not necessarily capture those who most often possess drugs or engage in unlawful behavior. Instead, it captures impoverished persons and racial minorities at a disproportionate rate.

121. Individuals living in poverty face a far greater risk of being fined, arrested, and targeted for minor drug crimes than other members of society. Karen Dolan & Judy Carr, *The Poor Get Prison,* Institute for Policy Studies 6 (2015).[19]

122. To compound this phenomenon, the racial wealth gap in Pennsylvania is one of the most drastic in the nation: the average Black Philadelphian lives in a neighborhood with a poverty rate of 24.8%, compared to an average neighborhood poverty rate of 8.4% for Whites. John Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics and Asians in Metropolitan America*, Brown University, p. 7 (2011).[20] The racial wealth gap is not limited to Philadelphia; such inequality is found throughout the entire state.

123. In 2016, Black Philadelphians were 3.6 times more likely to be arrested for marijuana possession than white Philadelphians, despite equivalent usage rates across both populations. *Cannabis Crackdown Report*, ACLU of Pennsylvania (2017).[21]

---

[18] https://www.aclupa.org/issues/criminaljustice/cannabis-crackdown/
[19] http://www.ips-dc.org/wp-content/uploads/2015/03/IPS-The-Poor-Get-Prison-Final.pdf
[20] https://s4.ad.brown.edu/Projects/Diversity/projects/authors_su.htm
[21] https://www.aclupa.org/issues/criminaljustice/cannabis-crackdown/

124.    Across the entire state of Pennsylvania, data from 2010 to 2016 shows that Black adults are 6.1 times more likely to be arrested for marijuana offenses than Whites.  *Id.*

125.    Pennsylvania's drug suspension scheme lacks a rational connection to legitimate state interests.  Even worse, it does so using drug convictions as a triggering event, arbitrarily isolating a group of people that do not necessarily pose a risk to road safety or break the law more often than others.  Pennsylvania's scheme of targeting people with drug convictions for license suspension not only lacks any rational basis — it is based on a determination that has been filtered through systemic discrimination rather than one that captures unsafe drivers.

126.    Defendants' license suspension scheme is problematic because it discriminates against people with drug convictions in a way that is irrational and in fact counterproductive. Plaintiffs do not challenge the license suspension scheme as race-based discrimination; they do, however, note that the irrationality of Defendants' scheme is underscored by its reliance on a functionally arbitrary and racially skewed measure.

   **D.    Defendants' Practice of Automatically Suspending the Driver's License of Anyone with a Drug Conviction Violates Plaintiffs' Procedural Due Process Rights**

127.    Plaintiffs have a property interest in their drivers' licenses that may not be deprived without due process of law. *Bell v. Burson*, 402 U.S. 535, 539 (1971).  The Department of Transportation automatically deprives any person with a drug conviction of their property interest in their license without providing *any process whatsoever* — highlighting the irrationality and prejudice of Defendants' scheme.

128.    Defendants' scheme cannot be logically justified by any state interest, because the state makes no attempt to determine *which* people with drug convictions fit criteria related to the state's interest in regulating driving.  Instead, the license suspension statute impermissibly

creates an irrebuttable presumption that people with drug convictions meet some sort of unspoken criteria for license suspension that furthers the state's interest.

129.    For instance, if the state's interest is in keeping dangerous drivers off the road, § 1532(c) creates an irrebuttable presumption that anyone convicted of a drug offense is an unsafe driver.  Because the state provides no due process when making this determination, people with drug convictions are deprived of their liberty and property interests with no reasonable opportunity to show that their conviction was unrelated to traffic safety, that they have never driven under the influence, or that they pose no danger to traffic safety.

130.    Whatever the state's asserted interests in regulating driver's licenses, drug convictions are an impermissible proxy for automatically determining deprivation of a license. Drug-related convictions, in and of themselves, have no relation to traffic safety. By creating an irrebuttable presumption against people with drug convictions — and automatically depriving them of their liberty and property interests without any process whatsoever — Defendants violate Plaintiff's procedural due process rights under the Due Process Clause of the Fourteenth Amendment.

**E.    Defendants' Debilitating License Suspension Scheme Violates Plaintiffs' Substantive Due Process Rights Because It Deprives Them of Their Fundamental Right to Travel**

131.    Plaintiffs have a fundamental substantive due process right to local travel.  *Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3rd Cir. 1990) (holding that the Due Process Clause encompasses "the right to move freely about one's neighborhood or town, even by automobile" as a fundamental right).

132.    Plaintiffs have had virtually every aspect of their lives affected by license suspension: they have been deprived of their ability to reliably travel by automobile to make doctor's appointments, care for loved ones, engage in previously-held lawful employment, attend

court-ordered appointments, see their family members, or run errands and go about their daily activities in their neighborhood or town.

133.    Plaintiffs are indigent and cannot afford to pay for taxis or other car services to maintain all their transportation needs for the extended duration of their license suspension.

134.    Due to Pennsylvania's weather conditions — and that Plaintiffs respectively must carry cleaning equipment to and from work, and must care for a vulnerable premature infant — public transportation and non-motorized modes of transport, such as walking or biking, are not feasible alternatives.

135.    Thus, Plaintiffs' only reliable form of transportation is to drive a personal vehicle — a right that has been entirely deprived under all circumstances by Defendants.

136.    Plaintiffs have been deprived of their fundamental right to intrastate travel under a prejudiced policy that achieves no legitimate government interest.

137.    Because it implicates a fundamental liberty interest, Defendants' suspension scheme must be narrowly tailored to achieve compelling state objectives or must be a time, place and manner restriction narrowly tailored to achieve significant state objectives. *Lutz*, 899 F.2d at 269–70 (analyzing the due process right of localized travel under the time, place and manner doctrine, and holding that any law infringing the fundamental right to local travel "will be subjected to intermediate scrutiny, and will be upheld if it is narrowly tailored to meet significant city objectives").

138.    Crime deterrence and traffic safety are significant state interests, but automatic suspension of driver's licenses for all people convicted of drug offenses is not rationally related, much less narrowly tailored, to those objectives.   Forbidding former drug offenders (whose offenses are unrelated to traffic safety) from driving at all times in all locations under all

circumstances is not narrowly tailored to any compelling government interest. Indeed, Pennsylvania's suspension scheme is counterproductive.

139.    Nor is Defendants' scheme a neutral time, place and manner restriction on driving narrowly tailored to serve significant government interests.

140.    Defendants' scheme is not neutral: it specifically targets people convicted of drug offenses, with no consideration of or connection to traffic safety.

141.    Defendants' punitive suspension scheme is not a narrowly tailored time, place and manner restriction, as it is unlimited in scope: it is a broad prohibition on all driving in all locations at all times in all circumstances for anyone convicted of a drug offense, without exception, for up to two years.

142.    Defendants' scheme contains no exceptions for medical emergencies, family emergencies, or to allow a former drug offender to pursue lawful work. Indeed, Defendants specifically prohibit people whose licenses are suspended under 75 Pa. C.S.A § 1532(c) from obtaining an Occupational Limited License. 75 Pa. C.S.A. 1553(d)(10).

143.    Erecting barriers to successful rehabilitation is not a significant state interest; increasing punishment for crimes already adjudicated is not a significant state interest; and keeping safe drivers off the road is not a significant state interest.

144.    Accordingly, Defendants' irrational suspension scheme is not narrowly tailored to any significant government interest and deprives Plaintiffs of their fundamental right to intrastate travel in violation of the Due Process Clause.

> **i.    Pennsylvania's Lack of Reliable Public Transportation Exacerbates the Deprivation of Plaintiffs' Fundamental Right to Local Travel**

145.    The unreliability of Pennsylvania's public transportation exacerbates the difficulties faced by people deprived of their right to intrastate and local travel. An analysis of

hundreds of performance reports from the Southeastern Pennsylvania Transportation Authority (SEPTA) — the public transit system serving Philadelphia — found that SEPTA was "consistently unreliable." Jared Whalen, *SEPTA: It's a Long, Long Ride,* Philadelphia Inquirer (Aug 14, 2016).[22]

146.    In 2015, 400,000 SEPTA trains — or one in five — were late, and another 1,283 were cancelled altogether. *Id.* The study concluded that "SEPTA's unreliability is endemic across all lines and all times of day." *Id.*

147.    This phenomenon is not limited to Philadelphia; of the 290 cities providing public ridership data to the National Transit Database in 2013, the majority of Pennsylvania's main urban areas rank in the bottom half. Reuben Fischer-Baum, "How Your City's Public Transit Stacks Up," *FiveThirtyEight* (July 31, 2014).[23]

148.    Many impoverished persons have service-industry jobs that require irregular hours outside the typical nine-to-five work day, with no time flexibility or tolerance for consistent tardiness. For a poor person with a suspended license, relying on public transportation to consistently arrive on time to work can be extremely challenging and time consuming, if possible at all.

149.    For individuals with medical needs, unreliable public transportation can impose severe hardship. Harsh weather conditions coupled with long wait times and cancellations can make accessing medical care extremely difficult or impossible, and may even pose a danger to the health of young children and elderly family members.

150.    Deprivation of the fundamental right to intrastate travel not only burdens those with drug convictions, but also their family members. Preventing safe drivers from using an

---

[22] http://www.philly.com/philly/business/transportation/septa_regional_rail_trains_timetable_reliability.html

[23] https://fivethirtyeight.com/datalab/how-your-citys-public-transit-stacks-up/

automobile to move about their neighborhood or town does nothing to promote state interests; indeed, it lowers the chances of successful rehabilitation, jeopardizes public health, and increases the chances of recidivism.

151.    Without reliable transportation alternatives, and having been dispossessed of their right to travel locally by automobile under any circumstances, Plaintiffs' fundamental right to intrastate travel has been denied in violation of the Due Process Clause.

### Class Action Allegations

152.    The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, to assert the claims alleged in this Complaint on a common basis.

153.    A class action is a superior means, and the only practicable means, by which the named Plaintiffs and unknown Class Members can challenge Defendants' unlawful suspension scheme.

154.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(l)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

155.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

156.    Plaintiffs propose one Class seeking declaratory and injunctive relief. The Declaratory and Injunctive Class is defined as: All individuals whose Pennsylvania driver's licenses are currently suspended or will be suspended due to conviction of any offense involving the possession, sale, delivery, offering for sale, holding for sale, or giving away of any controlled substance under the laws of the United States, Pennsylvania, or any other state.

**A.    Numerosity — Fed. R. Civ. P. 23(a)(1)**

157.    On information and belief, between 2011 and 2016, Defendants suspended the licenses of nearly 149,000 drivers for drug convictions.

158.    On information and belief, thousands of people in Pennsylvania currently have a suspended license for a drug-related conviction.

**B.    Commonality — Fed. R. Civ. P. 23(a)(2)**

159.    The relief sought is common to all Class Members, and common questions of law and fact exist as to all Class Members.  The named Plaintiffs seek relief concerning whether the suspension scheme violates the rights of the Class Members and relief mandating that Defendants end the scheme so that the constitutional rights of the Class Members will be protected in the future.

160.    These common legal and factual questions arise from one scheme: Defendants' automatic suspensions for all drug-related convictions. The material requirements of the suspension statute do not vary from Class Member to Class Member, and the resolution of these legal and factual issues will determine whether all Class Members are entitled to the relief they seek.

161.    Among the most important, but not the only, common questions of fact are:

- Whether Pennsylvania has a policy and practice of punishing people with drug convictions more harshly than people with other types of convictions and
- Whether Pennsylvania, acting by and through Defendants, has a policy and practice of suspending the driver's licenses of people who pose no demonstrated risk to traffic safety simply based on their drug conviction.

162.    Among the most important, but not the only, common questions of law are:

- Whether fundamental principles of equal protection forbid Pennsylvania from treating people with drug convictions more harshly than people with other types of convictions;
- Whether suspending a person's driver's license for an offense not related to driving or traffic safety is lawful; and
- Whether principles of due process prohibit Defendants from automatically depriving individuals with drug convictions of their property interest in a driver's license without any procedure;

- Whether principles of due process prohibit Defendants from infringing on the fundamental right to travel by suspending the driver's licenses of all individuals with drug convictions.

C.    **Typicality — Fed. R. Civ. P. 23(a)(3)**

163.    The named Plaintiffs' claims are typical of the other Class Members' claims, and they have the same interests in this case as all other Class Members.  Each Class Member has had or will have their driver's license or driving capability suspended due to a drug-related conviction not involving traffic safety.  The answer to whether Defendants' suspension scheme is unconstitutional will determine the claims of the named Plaintiffs and every other Class Member.

164.    If the named Plaintiffs succeed in the claim that Defendants' policies and practices concerning drug-related suspensions violate their constitutional rights, that ruling will likewise benefit every other Class Member.

D.    **Adequacy — Fed. R. Civ. P. 23(a)(4)**

165.    The named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same basic constitutional claims.  They are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class Members.

166.    There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional rights in the face of Defendants' suspension scheme.

167.    Plaintiffs are represented by attorneys from Equal Justice Under Law and Goldstein Mehta LLC, who have experience in litigating complex civil rights matters and criminal matters in federal court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law.

168.    The combined efforts of Class counsel have so far included extensive investigation into Defendants' suspension scheme, including interviewing attorneys in the region, statewide experts in the functioning of state and local courts, and national experts in constitutional law, law enforcement, judicial procedures, and criminal law.

169.    Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.

170.    As a result, counsel have devoted enormous time and resources to becoming intimately familiar with Defendants' scheme and with the relevant state and federal laws.  The interests of the Class Members will be fairly and adequately protected by the named Plaintiffs and their attorneys.

**E.    Rule 23(b)(2)**

171.    Class action status is appropriate because Defendants have acted or will act in the same unconstitutional manner with respect to all Class Members.  Defendants enforce a punitive and counterproductive suspension scheme by suspending the license of any person convicted of a drug offense — with no consideration of the seriousness of the offense or the offender's traffic safety record.

172.    The Class therefore seeks declaratory and injunctive relief to enjoin Defendants from enforcing automatic license suspensions for drug convictions.  Because the putative Class challenges Defendants' scheme as unconstitutional through declaratory and injunctive relief that would apply the same relief to every Class Member, Rule 23(b)(2) certification is appropriate and necessary.

173.    Injunctive relief compelling Defendants to comply with these constitutional rights will similarly protect each Class Member from being subjected to Defendants' unlawful policies and practices.  A declaration and injunction stating that Defendants cannot suspend driver's

licenses as a punishment for a drug conviction would provide relief to every Class Member. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

## Claims for Relief

174.    Plaintiffs do not challenge the validity of their underlying criminal convictions; instead, they challenge Defendants' policy of aggravating those convictions through a discriminatory and punitive license suspension scheme that is logically unrelated to their convictions or any legitimate government purpose.

**COUNT ONE: Defendants' Counterproductive Suspension Scheme Violates Equal Protection Because It Discriminates Against People with Drug Convictions Without a Rational Connection to a Legitimate State Purpose**

175.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

176.    Plaintiffs have a right to be free from arbitrary and discriminatory government classifications.  Defendants' state-sanctioned policy discriminates between those convicted of drug offenses and those convicted of all other criminal offenses, prescribing additional punishment for the former.  Because Defendants' discriminatory policy is not rationally related to any legitimate government interest, it violates the Equal Protection Clause of the Fourteenth Amendment.

**COUNT TWO:  Defendants' Irrational Scheme of Automatically Suspending Licenses for Drug-Related Convictions Violates Procedural Due Process Because It Creates an Irrebuttable Presumption Against Plaintiffs, Depriving Them of Their Property Rights**

177.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

178.    Plaintiffs have a property interest in their drivers' licenses that may not be deprived without due process of law.  *Bell v. Burson*, 402 U.S. 535, 539 (1971).  The Department

of Transportation automatically deprives them of their property interest in their license without providing any process whatsoever, on the basis of an irrebuttable presumption that they are the type of people whom the state is interested in keeping off the road.  Because Plaintiffs have been automatically deprived of their property rights without an opportunity to rebut the presumption against them, Defendants have violated their procedural due process rights.

**COUNT THREE: Defendants' Vindictive Suspension Scheme Violates Substantive Due Process Because It Deprives Them of the Fundamental Right to Intrastate Travel Without Being Narrowly Tailored to Achieve a Significant Government Interest**

179.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

180.    Plaintiffs have protected property and liberty interests in their driver's licenses and their ability to drive legally, and the Third Circuit recognizes their fundamental right to intrastate travel under the Due Process Clause.  Because Plaintiffs have no viable alternative to driving, Defendants' suspension of their licenses burdens their right to localized, intrastate travel without being narrowly tailored to any significant government interest.

### Requested Relief

WHEREFORE, Plaintiffs request that the Court issue the following relief:

a.    A declaratory judgment that Defendants' policies, practices, acts, and/or omissions as described herein are unlawful and violate Plaintiffs' rights under the Constitution and laws of the United States;

b.    An order and judgment preliminarily and permanently enjoining Defendants, their subordinates, agents, employees, representatives, and all others acting or purporting to act in concert with them or on their behalf from issuing or processing orders of driver's license suspensions for drug offenses that do not involve traffic safety until such time as the State of Pennsylvania implements a system that complies with the United States Constitution;

c.    An order and judgment preliminarily and permanently ordering Defendants to reinstate the Plaintiffs' driver's licenses (insofar as they are suspended based on conviction of a non-traffic related drug offense);

d.    An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems proper.

Respectfully submitted,

/s/ Phil Telfeyan
Phil Telfeyan (*pro hac vice* pending)
Catherine Sevcenko (*pro hac vice* pending)
Rebecca Ramaswamy (*pro hac vice* pending)
Marissa Hatton (*pro hac vice* pending)
Attorneys, Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004
(202) 670-1004
ptelfeyan@equaljusticeunderlaw.org
catherine@equaljusticeunderlaw.org
rramaswamy@equaljusticeunderlaw.org
mhatton@equaljusticeunderlaw.org

/s/ Zak Goldstein
Zak Goldstein (Pa. Bar No. 312128)
Goldstein Mehta LLC
1221 Locust St.
Philadelphia, PA 19107
(267) 225-2545
ztg@goldsteinmehta.com

*Attorneys for Plaintiffs*